NO. 14-1130

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

TIM KERIN, on behalf of himself
and all others similarly situated

Plaintiff-Appellant,

v.

TITEFLEX CORPORATION t/a GASTITE,

Defendant-Appellee.

_____

ON APPEAL FROM A DECISION OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS,
WESTERN DIVISION

_____

**BRIEF OF DEFENDANT-APPELLEE**

_____

Charles B. Casper                     Jeffrey E. Poindexter
John G. Papianou                      Jodi K. Miller
Montgomery, McCracken,                Bulkley Richardson and Gelinas, LLP
  Walker & Rhoads, LLP                1500 Main Street, Suite 2700
123 South Broad Street                Springfield, MA 01115-5507
Philadelphia, Pennsylvania  19109     Tel:  (413) 781-2820
Tel.:  (215) 772-1500                 Fax:  (413) 785-5060
Fax:   (215) 772-7620

*Attorneys for Defendant-Appellee Titeflex Corporation*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Titeflex Corporation t/a Gastite ("Titeflex"), discloses that Smiths Group International Holdings Ltd. is Titeflex's parent company and owns 100% of Titeflex.  Titeflex further discloses that Smiths Group PLC is the parent company and 100% owner of Smiths Group International Holdings Ltd.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD ..................... vii

I. JURISDICTIONAL STATEMENT ........................................... 1

II. STATEMENT OF THE ISSUES ............................................. 1

III. STATEMENT OF THE CASE.................................................. 3

IV. SUMMARY OF THE ARGUMENT ......................................... 7

V. STANDARD OF REVIEW ..................................................... 9

VI. ARGUMENT ....................................................................... 9

   A. The District Court's Dismissal of Kerin's Complaint Under Rule 12(b)(1) for Lack of Article III Standing Should Be Affirmed Because He Suffered No Legally Cognizable Harm......................................... 9

      1. Kerin Lacks Standing Because He Faces No Imminent Risk of Harm. ..................................................................................11

      2. Kerin's Purported Overpayment Does Not Suffice to Confer Article III Standing....................................................................21

      3. The Invasion of a State-Created Legal Right Alone Is Insufficient for Article III Standing. ...............................................................26

   B. The District Court Properly Dismissed the Complaint Because It Fails to Sufficiently Plead a Cognizable Injury Under Massachusetts Law. ............................................................................................ 28

   C. The Economic Loss Rule Bars Kerin's Claims. .............................. 32

   D. Kerin's Strict Liability Claims Were Properly Dismissed Because Massachusetts Does Not Recognize the Tort of Strict Liability Apart From Breach of Warranty. ............................................................. 34

VII. CONCLUSION .................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Amnesty Int'l v. Clapper*, 638 F.3d 118 (2d Cir. 2011)....................................12, 15

*Ashley v. Boch Toyota, Inc.*, 1992 WL 41980
  (Mass. App. Div. Mar. 4, 1992)........................................................................ 32

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003)...............................................17, 18

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014) .......................................9, 10, 12, 16

*Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) .............................. 26

*Clapper v. Amnesty Int'l*, 133 S. Ct. 1138 (2013)...........................................passim

*Cole v. General Motors Corp.*, 484 F.3d 717 (1st Cir. 2007) .........................24, 25

*Comer v. Murphy Oil USA*, 585 F.3d 855 (5th Cir. 2009) .................................... 26

*Commonwealth v. Johnson Insulation*, 425 Mass. 650 (1997).............................. 32

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986).............. 33

*FMC Corp. v. Boston Edison Co.*, 415 Mass. 393 (1993).................................... 33

*Goode v. City of Philadelphia*, 539 F.3d 311 (3d Cir. 2008) ................................ 27

*Hall v. Omega Flex, Inc.*, No. 0:13-cv-61213, slip op.
  (S.D. Fla. Jan. 17, 2014) ................................................................................... 7

*Holtzman v. General Motors Corp.*, 2002 WL 1923883
  (Mass. Sup. Ct. July 2, 2002)............................................................................ 32

*Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008) ................................passim

*In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24 (D. Mass. 2008)......... 26

*In re Fruit Juice Prods. Mktg. and Sales Practices*, 831 F. Supp. 2d. 507
  (D. Mass. 2011)..............................................................................................22, 23

*In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990).............. 20

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
   2014 WL 1858458 (D.D.C. May 9, 2014) ........................................................ 17

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
   2014 WL 223677 (S.D. Cal. Jan. 21, 2014) .........................................15, 16, 17

*In re St. Jude Med., Inc.*, 2003 WL 1589527 (D. Minn. Mar. 27, 2003) .............. 20

*Katz v. Pershing, LLC*, 672 F.3d 64 (1st Cir. 2012) ......................................passim

*Koronthaly v. L'Oreal USA Inc.*, 374 F. App'x 257 (3d Cir. 2010) ..................... 23

*Lewis v. Gen. Elec. Co.*, 37 F. Supp. 2d 55 (D. Mass. 1999) ............................... 34

*Low v. LinkedIn Corp.*, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) ............... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).........................................6, 10

*Marcil v. John Deere Indus. Equip. Co.*, 9 Mass. App. Ct. 625 (1980) ............... 33

*Mason v. Gen. Motors Corp.*, 397 Mass. 183 (1986)........................................... 35

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) .......................24, 25

*Metropolitan Express Servs., Inc. v. City of Kansas City, Mo.*, 23 F.3d 1367
   (8th Cir. 1994)................................................................................................... 26

*Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
   418 F.3d 168 (2d Cir. 2005) ............................................................................. 26

*Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d 429 (E.D.N.Y. 2007)...... 19

*Natural Resources Defense Council, Inc. v. U.S. Food and Drug Administration*,
   710 F.3d 71 (2d Cir. 2014) ...........................................................................17, 18

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)......................................... 27

*Pisciotta v. Old Nat'l Bankcorp*, 499 F.3d 629 (7th Cir. 2007) ........................... 16

*Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372
   (D. Mass. 2008)................................................................................................. 35

*Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011) ......................................14, 24

*Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002) ............................... 22

*Rule v. Fort Dodge Animal Hosp., Inc.*, 604 F. Supp. 2d 288
  (D. Mass. 2009)....................................................................................27, 33

*Sea Shore Corp. v. Sullivan*, 158 F.3d 51 (1st Cir. 1998) ..................................... 11

*Sebago, Inc. v. Beazer East, Inc.,* 18 F. Supp. 2d 70 (D. Mass. 1998) ................. 33

*Smith v. Robertshaw Controls Co.*, 410 F.3d 29 (1st Cir. 2005) ........................... 35

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .................................. 9

*Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568 (6th Cir. 2005)................19, 20

*Swartz v. Gen. Motors Corp.*, 375 Mass. 628 (1978)............................................ 35

*Waste Connections Inc. v. Chevedden*, 2014 WL 554566
  (5th Cir. Feb. 13, 2014) ..................................................................... 16

*Watkins v. Omni Life Science, Inc.*, 692 F. Supp. 2d 170
  (D. Mass. 2010)................................................................................30, 31, 32

*Yunker v. Pandora Media, Inc.*, 2013 WL 1282980
  (N.D. Cal. Mar. 26, 2013)................................................................... 17

## Statutes

28 U.S.C. § 1291................................................................................................ 1

28 U.S.C. § 1332(d)(2) ...................................................................................... 1

## Other Authorities

Int'l Fuel Gas Code § 310.1 ............................................................................. 19

Int'l Residential Code § G2411.1.1 .................................................................. 19

Mass. Bd. of State Examiners of Plumbing and Gas Fitters, Product Policy
  Regarding Corrugated Stainless Steel Tubing (CSST) (Feb. 4, 2009)................ 4

National Fuel Gas Code NFPA 54 .................................................................3, 19

## Rules

Federal Rule of Civil Procedure 12(b)(1).......................................................7, 25

Federal Rule of Civil Procedure 12(b)(6)........................................................... 2

v

## **Regulations**

10-2-24 R.I. CODE R. § 303, Rhode Island State Building Code § 310.1.1........... 19

248 C.M.R. 4.00, *et seq.* .......................................................................4, 8

248 C.M.R. 4.00, *et seq.* (eff. Feb 25, 1994) .......................................... 3

248 C.M.R. 5.00, *et seq.* .......................................................................4, 8

248 C.M.R. 5.00, *et seq.* (eff. Feb 24, 1994) .......................................... 3

248 C.M.R. 5.03 .................................................................................. 19

248 C.M.R. 6.00, *et seq.* (eff. Feb 25, 1994) .......................................... 3

CAL. CODE REGS. tit. 25, § 4517.4(b).................................................... 19

MD. CODE REGS. 09.20.01.04............................................................... 19

N.Y. COMP. CODES R. & REGS. tit. 19 § 1220.1, 2010 Residential Code of New York State § 310.2.......................................................................... 19

## **Constitutional Provisions**

Article III, section 2 of the U.S. Constitution.....................................7, 9

**REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD**

Oral argument is unnecessary both because the dispositive issues have been authoritatively decided by the United States Supreme Court and this Court, and because the parties adequately presented the facts and legal arguments in their briefs.

## I.    JURISDICTIONAL STATEMENT

Plaintiff-Appellant Tim Kerin ("Kerin"), a Florida resident, filed this lawsuit in Massachusetts against Defendant-Appellee Titeflex Corporation ("Titeflex"). RA9-10 ¶¶ 8, 10.  He owns a house in Florida that allegedly contains corrugated stainless steel tubing ("CSST") that Titeflex manufactures (called "Gastite® CSST").  RA9 ¶ 8.   Kerin sought to represent himself and a proposed class of "[a]ll persons or entities in the Commonwealth of Massachusetts who purchased a house, or other structure, on which Titeflex's Gastite® is installed."  RA22 ¶ 16. He alleged common law claims for: (1) strict liability for alleged design and manufacturing defects; (2) negligence for failure to test; (3) negligence for failure to warn; and (4) strict liability for failure to warn.  RA25-29.

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  Titeflex does not contest venue in the District of Massachusetts. RA10 ¶¶ 14-15.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's Order of January 7, 2014, granting Titeflex's Motion to Dismiss, was a final decision that disposed of all claims in the lawsuit.

## II.    STATEMENT OF THE ISSUES

A.    Whether the district court properly dismissed appellant's claims because he failed to allege a legally cognizable injury sufficient to confer

1

Article III standing where (1) Massachusetts (and every other State in the country) approves the use of CSST products, (2) appellant has not alleged actual harm caused by Gastite® CSST, (3) appellant has not alleged an imminent risk of harm, (4) appellant admits the product has caused no harm in **over** 99.99 percent of installations, (5) appellant has not alleged (and cannot allege) that, in the 0.00282 percent of cases where a fire (the alleged harm) may have "involved" CSST, Gastite® CSST was present or caused the fire, and (6) appellant admits there may be no risk of failure if Gastite® CSST is properly installed.

B.     Whether the district court properly dismissed appellant's claims under Federal Rule of Civil Procedure 12(b)(6), even assuming he had standing, because Massachusetts does not permit claims for purely economic loss where an allegedly defective product has not malfunctioned and where the purchaser does not allege that it fails to meet a standard "legally required by and enforced by the government." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 633 (2008).

C.     Whether Massachusetts' economic loss rule bars appellant's claims because he seeks only economic damages unaccompanied by personal injury or harm to other property.

D.     Whether appellant's strict liability tort claims should be dismissed because Massachusetts law does not recognize claims for strict liability in tort.

2

III.   <u>**STATEMENT OF THE CASE**</u>

CSST is a thin, flexible piping used to transport gas in residential and

commercial structures.  RA7 ¶ 2.  Massachusetts first permitted the installation and

use of CSST in any home in the Commonwealth over twenty years ago.[1]

Massachusetts recognizes, as does every State, that CSST is a safe and efficient

means of distributing gas.  *See* RA36-37 (Kerin "concedes that CSST generally,

and Gastite specifically, is used widely and is approved by both governmental and

regulatory entities").  Titeflex is one of several CSST manufacturers.  RA12 ¶ 23.

Although the installation and use of CSST is permitted nationwide, Kerin

nonetheless sued Titeflex alleging CSST is "susceptible to perforation by an

electrical arc generated by a lightning strike," which, he alleges, could cause a fire.

RA8 ¶ 3.  But to mitigate the remote risk from lightning, the National Fire

Protection Association's ("NFPA") National Fuel Gas Code ("NFGC") includes a

requirement for bonding and grounding CSST to give lightning—if it should

strike—a safe path to ground.  RA7-8 ¶ 32; *see also* NFGC NFPA 54.  "Bonding is

the process of making an electrical connection between the grounding electrode

[such as a ground rod or a cold water pipe] and any equipment, appliance, or metal

---

[1] *See* 248 C.M.R. 4.00, *et seq.* (eff. Feb 25, 1994) (adopting NFPA 54, 1992 ed.,
which recognized the use of CSST, in the Massachusetts Fuel Gas Code); 248
C.M.R. 5.00, *et seq.* (eff. Feb 24, 1994) and 248 C.M.R. 6.00, *et seq.* (eff. Feb 25,
1994) (modifying CSST-related provisions of NFPA 54, 1992 ed.).

conductor [here, the CSST]."  RA13-14 ¶ 32.  In Massachusetts, consistent with the requirement of the current edition of the NFGC NFPA 54, the Board of State Examiners of Plumbers and Gas Fitters, the state body that regulates the installation of gas piping systems, approves the use of CSST so long as a licensed electrician installs a direct bonding connection to ground in accordance with the manufacturer's instructions.  *See* Mass. Bd. of State Examiners of Plumbing and Gas Fitters, Product Policy Regarding Corrugated Stainless Steel Tubing (CSST) (Feb. 4, 2009) (included in attached Defendant-Appellee's Addendum).[2]

Kerin admits that "an electrical bond between the CSST and the building's grounding electrode might address this issue."  RA13 ¶ 32.  And his own allegations establish that in over 99.99 percent of homes with CSST in the United States no issue "involving lightning and CSST" has been reported.  RA15 ¶ 39. Specifically, he alleges "over 750 million feet of CSST have been installed in over 5 million homes across the United States" and that "[a]s of August 2011, 141 fires involving lightning and CSST have been reported."  RA13, 15 ¶¶ 28, 39.  Thus, according to Kerin's allegations, approximately 0.00282 percent of homes with CSST (*i.e.*, 141/5,000,000) have reported a fire "involving" lightning and CSST. RA9 ¶ 39.  Even that minuscule figure overstates any risk of fire.  Kerin does not

---

[2] The Massachusetts Fuel Gas Code currently adopts, with some modifications, the 2002 edition of NFGC NFPA 54.  *See* 248 C.M.R. 4.00, *et seq.*; 248 C.M.R. 5.00, *et seq.* (selected sections attached hereto in Defendant-Appellee's Addendum).

allege that in any of those 141 reported cases CSST *caused* the fire, that the CSST was properly installed, or that the CSST was Gastite® CSST.  Nor does Kerin allege that CSST attracts lightning to his home.[3]

Kerin has reported no issue with the CSST in his home.  RA36-37; RA21-22 ¶¶ 59-62.  Yet he alleges his CSST poses "an unreasonable risk of fire due to lightning strikes," RA9 ¶ 7, because *if* lightning were to strike his home or near it, and *if* the electricity from the lightning strike were to contact his CSST, and *if* the electricity were to jump (*i.e.*, "arc") between the CSST and other metal systems in the house, it *may* perforate the CSST.  RA13-14 ¶¶ 30-32.  As a result, Kerin claims that although he "and members of the Class … are forced to repair and/or replace Gastite®, they have neither been reimbursed for or advanced the costs associated with this undertaking."  RA22 ¶ 62.  Kerin sought compensatory damages in an amount equal to the cost to remove and replace the CSST in his Florida home, and the CSST in every structure in Massachusetts.  RA22 ¶ 62, RA23 ¶¶ 65j-k.

_____

[3] Though not necessary to the disposition of this appeal, it is worth noting that lightning is one of nature's most potent forces and may damage or destroy any house it strikes—*regardless of whether CSST has been installed*.  The U.S. National Oceanic and Atmospheric Administration reports that "lightning starts about 4,400 house fires *each year*, costing somewhere around $283 million. … About 16 fire deaths are attributed to lightning-caused fires each year, most of which are the occupants of houses that ignited by lightning." http://www.lightningsafety.noaa.gov/fire.htm (emphasis added) (last visited June 8, 2014).

Because Kerin's Complaint fails to allege a "concrete and particularized" injury that was "actual or imminent, not conjectural or hypothetical," sufficient to satisfy "the irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted), Titeflex moved to dismiss it.  The district court agreed and dismissed Kerin's claims, holding "it is obvious that Plaintiff cannot clear the injury in fact hurdle."  RA37.  "[T]he strand of conjecture necessary to support Plaintiff's causes of action is simply too attenuated."  RA37-38.  Recognizing that "the capriciousness of lightning strikes is the stuff of folklore," the district court rightly found "the possibility of some negative consequences arising from this genus of caprice is so speculative that it simply cannot provide a foundation for a claim in federal court that satisfies the requirements for Article III standing."  RA38.

The district court held, as an additional basis for dismissal, that even if Kerin had Article III standing, he nevertheless failed to state a claim under Massachusetts law because none of his claims satisfied the requirements the Supreme Judicial Court established in *Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008), for pleading an alleged overpayment as a cognizable economic injury in a products liability case like this one where the plaintiff alleges no personal injury or property damage.  RA38-39.

6

## IV.   <u>SUMMARY OF THE ARGUMENT</u>

The district court properly dismissed Kerin's Complaint under Federal Rule of Civil Procedure 12(b)(1) because he was "obviously" unable to "clear the injury in fact hurdle" required to confer standing under Article III of the U.S. Constitution.  RA37.  Although Kerin, a Florida resident, claims the CSST in his Florida home is unreasonably dangerous because it may fail if struck by lightning,[4] his own allegations show this assertion to be too far-fetched to support standing.

Indeed, even if a lightning bolt struck and found its way to the CSST in his home, Kerin *concedes* nothing may happen if his CSST is properly installed. RA13-14 ¶ 32.  And contrary to Kerin's assertion (Brief of Plaintiff-Appellant ("Kerin Br.") 21), Titeflex does not argue that the law requires Kerin to wait until he has suffered an actual injury before he may sue for the purchase of an allegedly defective product.  A risk of harm can constitute an injury in fact under Article III but it "'must be *certainly impending*'" in order to do so.  RA28 (quoting *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013)).  Because Kerin's allegations fell far

---

[4] The Southern District of Florida recently granted, for lack of standing, a motion to dismiss in favor of Omega Flex, Inc., another CSST manufacturer.  *Hall v. Omega Flex, Inc*., No. 0:13-cv-61213, slip op. (S.D. Fla. Jan. 17, 2014). Addressing allegations like those here, the court concluded, "Plaintiffs have not alleged that their [CSST] has malfunctioned, started a fire, caused any damage to persons or property, or otherwise failed to perform its intended function … .  Nor have Plaintiffs alleged that they have incurred costs to repair or replace the [CSST] in their homes."  *Id.* at 5.

short of "certainly impending," the district court properly dismissed his Complaint. RA38.

The district court correctly dismissed Kerin's Complaint on the additional basis that none of his four tort-based claims states a claim upon which relief can be granted under Massachusetts law. Kerin's claims do not satisfy *Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008), which allows claims of purely economic injury stemming from the purchase of an allegedly defective product that has not malfunctioned only if the product violates a legally required governmental standard. As Judge Ponsor observed, "Plaintiff concedes that the CSST in question does not violate any applicable regulatory standard." RA39. (To the contrary, Massachusetts *permits* CSST throughout the Commonwealth because it complies with Massachusetts regulations. *See* 248 C.M.R. 4.00, *et seq.*; 248 C.M.R. 5.00, *et seq.*)

Finally, although the district court did not reach the issue, the economic loss rule bars Kerin's claims, which all sound in tort, because he seeks economic damages unaccompanied by personal injury or harm to other property, *see Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (court may "affirm the order of dismissal on any ground made manifest by the record"), and his strict liability tort claims must be dismissed because Massachusetts does not recognize tort claims for strict liability.

8

## V.    <u>STANDARD OF REVIEW</u>

This Court applies a *de novo* standard of review to all legal issues involved in this appeal.  *Katz*, 672 F.3d at 71.  The Court "accept[s] as true all well-pleaded factual averments in the plaintiff's … complaint and indulge[s] all reasonable inferences therefrom in his favor."  *Id.* at 70 (quotation marks and citation omitted).  But "this tenet does not apply to statements in the complaint that merely offer legal conclusions couched as facts or are threadbare or conclusory, or to allegations so speculative that they fail to cross the line between the conclusory and the factual."  *Blum v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014) (quotation marks and citations omitted).

## VI.   <u>ARGUMENT</u>

### A.    **The District Court's Dismissal of Kerin's Complaint Under Rule 12(b)(1) for Lack of Article III Standing Should Be Affirmed Because He Suffered No Legally Cognizable Harm.**

The district court properly dismissed Kerin's Complaint because he lacks standing.  He suffered no "injury-in-fact."

Whether Kerin has standing is a fundamental question that goes to a federal court's subject matter jurisdiction under Article III, section 2 of the U.S. Constitution.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). This Court recently clarified that:

> In all cases, to establish Article III standing: [Plaintiffs must show] an injury [that is] concrete, particularized,

9

> and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.  Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.  Thus we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.

*Blum*, 744 F.3d at 796 (quoting *Clapper*, 133 S. Ct at 1147) (alteration in original) (quotation marks and citations omitted).  Particularity requires that the "plaintiff must have personally suffered some harm," and "actual or imminent injury ensures that the harm has either happened or is sufficiently threatening; it is not enough that the harm might occur at some future time."  *Katz*, 672 F.3d at 71 (citing *Lujan*, 504 U.S. at 560 n.1, 564).

A plaintiff must plead or prove his standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  Thus, on a motion to dismiss, the plaintiff must show that his complaint pleads facts that, taken as true, make standing plausible.  *See Katz*, 672 F.3d at 71, 77-78 (affirming dismissal for lack of standing and rejecting as inadequate allegations that did not plausibly allege an injury caused by defendant's conduct).

Here, Kerin claims he suffered an "injury in fact" based on an "increased risk of future harm."  Kerin Br. 16.  This basis for Article III standing does not

withstand scrutiny.  As Judge Ponsor found, Kerin's allegations of an "increased risk" of future harm are far too speculative to confer standing.  RA33-34.

In an attempt to circumvent his obligation to plead a "certainly impending" threatened injury, Kerin claims he has already suffered economic harm because he overpaid for a "defective" product.  Kerin Br. 14.  This bootstrapped theory fares no better because his alleged overpayment rests on the same speculative claim that the product has caused him an increased risk of injury.  He overpaid only if CSST posed a real undisclosed risk that would have caused buyers to pay less for CSST or his home, not the speculative conjectural risk he alleged.  Kerin lacks standing to pursue his claim under *any* theory because he failed to allege either an imminent risk of harm or actual harm that has already befallen him as Article III requires him to do.

## 1.    Kerin Lacks Standing Because He Faces No Imminent Risk of Harm.

Kerin lacks Article III standing because his allegations of future harm are too remote and speculative to constitute "injury-in-fact."  "'Future injury must be imminent to qualify as injury-in-fact' to ensure that the 'alleged injury is not too speculative.'"  *Katz*, 806 F. Supp. 2d at 457 (quoting *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 56 (1st Cir. 1998)).

The U.S. Supreme Court recently confirmed that allegations of future harm confer standing only if the threatened injury is "certainly impending."  *Clapper*,

11

133 S. Ct. at 1143.  Before *Clapper* reached the Supreme Court, the Second Circuit held that the plaintiffs (organizations and attorneys that communicated with persons of interest to U.S. national security agencies living abroad) had standing to sue because they faced an "objectively reasonable likelihood" the government would intercept their communications.  *Amnesty Int'l v. Clapper*, 638 F.3d 118, 133-34, 139 (2d Cir. 2011).  The Supreme Court reversed because the theory of injury "relies on a highly attenuated chain of possibilities" that did not "satisfy the requirement that threatened injury must be certainly impending."  *Clapper*, 133 S. Ct. at 1148.  The Court found it speculative whether the Government would "imminently target" communications to which the plaintiffs were parties.  *Id.*  And even if they could demonstrate "imminent targeting" of their communications, they could only "speculate as to whether the Government [would] seek to use [the statute at issue] … to do so."  *Id.* at 1149-51.

Earlier this year, this Court, applying *Clapper,* recognized that to satisfy Article III standing in cases like Kerin's alleging a risk of harm, the threatened injury must be certainly impending.  *Blum*, 744 F.3d at 796 (no Article III standing in case challenging federal law under First Amendment where plaintiffs had not shown a "certainly impending" threat of enforcement).

Similarly, in *Katz*, this Court affirmed the dismissal of a brokerage account holder's claims for lack of standing where she alleged "her injury is having to take

12

or forebear from some action," but the allegation was not "premised on a reasonably impending threat."  672 F.3d at 79.  She claimed she was compelled to purchase identity theft insurance because her broker failed to protect her personal information, but no hacker or thief had even accessed her personal information.  *Id*. Rather, her claim "rest[ed] entirely on the hypothesis that at some point an unauthorized, as-yet unidentified, third party might access her data and then attempt to purloin her identity."  *Id.*  This Court rejected the argument: "Given the multiple strands of speculation and surmise from which the plaintiff's hypothesis is woven, finding standing in this case would stretch the injury requirement past its breaking point."  *Id*. at 80.

Here, as in *Clapper*, *Blum*, and *Katz*, Kerin's allegations of future harm are far too speculative to confer standing.  As Judge Ponsor recognized: "The capriciousness of a lightning strike is the stuff of folklore," RA38; it is ***the*** proverbial rare event.  Kerin may suffer harm only:

- ***if*** lightning strikes his house, or if a lightning strike occurs "close" to it;[5]

- ***if*** the electrical energy created by the lightning strike "arc[s] between metal systems" in his house;[6]

---

[5] "In an indirect lightning strike, a strike close to a structure or house generates a partial lightning current in the metal links of the building."  RA13 ¶ 30.

[6] "This electrical energy in attempting to reach ground *may* arc between metal systems that have different electrical resistance."  *Id.* (emphasis added).

- ***if*** the arc damages the CSST's tubing wall;[7]

- ***if*** the damage to the tubing wall is in the form of a puncture;[8]

- ***if*** the puncture in the tubing wall results in the leaking of natural gas;[9] and

- ***if*** the natural gas ignites surrounding materials.[10]

Even then, Kerin concedes that if the CSST in his home is properly installed, nothing may happen.  RA13-14 ¶ 32.  These multiple layers of possibilities, all of which would have to occur for Kerin to sustain an injury, demonstrate his failure to plead the requisite imminence.  *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (observing that if a plaintiff's injury cannot be described without beginning the explanation with the word "if," then the alleged injury is too conjectural) (citation omitted).  It is unsurprising therefore that Kerin alleges only a minuscule percentage of homes (.00282 percent) have been the subject of a report of fire that "involved" CSST and lightning.  RA9 ¶ 39.  And Kerin does not allege in these 141 cases that the CSST caused the fire, was properly installed, or was a Titeflex-manufactured product.

---

[7]  "Arcing *can* cause damage to the metal systems."  *Id.* (emphasis added).

[8] "Damage caused by a direct or indirect lightning strike to a CSST system *can* be described as a small puncture of the tubing wall."  RA7 ¶ 31 (emphasis added).

[9] "A puncture in the tubing wall *can* ignite the natural gas at the hole."  *Id.* (emphasis added).

[10] "This gas *can* ignite surrounding materials to create an extensive fire…."  *Id.* (emphasis added).

Conceding "the lack of certainty regarding a future fire" ever occurring, Kerin Br. 17, Kerin attempts to distinguish *Clapper* because "the risk of future injury from government surveillance was too speculative where any future injury would require action by multiple, independent actors." Kerin Br. 18. But the chance lightning may strike Kerin's house, energize his CSST, perforate the tubing wall to find a path to ground, and start a fire, is ***far more*** remote than the chance the Government would intercept the plaintiffs' communications in *Clapper*. After all, the Second Circuit found the likelihood of Government interception to be "objectively reasonable," 638 F.3d at 133-34, 139. But even that objectively reasonable risk fell short of "certainly impending." *Clapper*, 133 S. Ct. at 1147-48. Moreover, the Supreme Court found the discretion of public officials to intercept communications just one of ***several*** reasons the plaintiffs' supposed risk of harm was too attenuated to confer standing. *Id.* at 1150. As here, multiple events would have had to occur before plaintiffs suffered injury-in-fact. *Id.*

Kerin downplays *Clapper* by saying "its treatment of speculation about human decisionmakers does not change the law regarding increased risk." Kerin Br. 19 (citing *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 2014 WL 223677, at *8-9 (S.D. Cal. Jan. 21, 2014) and *Waste Connections Inc. v.*

15

*Chevedden*, 2014 WL 554566, at *2 (5th Cir. Feb. 13, 2014)).[11]  But in *Blum*,

which Kerin fails to cite, this Court rejected the argument that only particular types

of claims must meet the "certainly impending" standard: "*Clapper* … draws no

such distinction and is expressly concerned with Article III injury requirements."

*Id.* at 799.  Of course, every case brought in federal court must meet Article III.

Kerin also improperly relies on data breach cases where actual events moved

the risk of harm from remote to certainly impending.  Kerin Br. 16-17, 20.  As this

Court recognized in *Katz*, the plaintiffs in *Pisciotta v. Old Nat'l Bankcorp*, 499

F.3d 629, 634 (7th Cir. 2007), alleged that their personal data "had ***actually been***

***accessed*** by one or more unauthorized third parties."  *Katz*, 672 F.3d at 80

(emphasis added).  And in *In re Sony Gaming*, plaintiffs similarly alleged their

personal information was wrongly disseminated.  2014 WL 223677, at *9.  The

court held that where personal information has been wrongfully disclosed, the

threat of future harm may be deemed "certainly impending" sufficient to establish

Article III standing.  *Id.* at *9.  In contrast, courts recognize that where no data

---

[11] In *Waste Connections,* the Fifth Circuit held *Clapper* "simply confirms the *well-established* requirement that threatened injury must be 'certainly impending.'" 2014 WL 554566, at *2 (quoting *Clapper*, 133. S. Ct. at 1143) (alteration in original).  It distinguished the plaintiffs there from those in *Clapper*, recognizing in *Clapper* the "alleged injury depended on a chain of events and, therefore, was not certainly impending."  *Id.* (quotation marks and citation omitted).

breach has occurred, the threat of future harm rests on a speculative chain of possibilities insufficient for standing. *See id.*; *Clapper*, 133 S. Ct. at 1149-50.[12]

Here, unlike *Pisciotta* and *In re Sony Gaming*, Kerin does not allege that ***any*** of the various contingencies that must happen for him to suffer an injury have occurred. To permit Kerin's claim to proceed would be like allowing a data breach claim ***where no hacking or unauthorized access has occurred***, but where a plaintiff alleges someone, somewhere, may try to hack a server, no matter how unlikely that may be. As this Court held in *Katz*, that is not enough. 672 F.3d at 80.

Nor can Kerin rely on *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), or *Natural Resources Defense Council, Inc. v. U.S. Food and Drug Administration* ("*NRDC*"), 710 F.3d 71, 78 (2d Cir. 2014), for the proposition that "an increased risk of future harm constitutes an actual injury to satisfy the constitutional standing

---

[12] *See also Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *5 (N.D. Cal. Mar. 26, 2013) ("Yunker does not allege that he disclosed sensitive financial information, such as a social security number or a credit card number, to Pandora. Further, he has not alleged that anyone has breached Pandora's servers."); *Low v. LinkedIn Corp.*, 2011 WL 5509848, at *6 (N.D. Cal. Nov. 11, 2011) (finding no injury-in-fact where plaintiff did not allege that his highly personal information had been stolen and then exposed to the public). Even in a case where a plaintiff did allege that personal data had been stolen, the District of Columbia held that the risk of identity theft was not certainly impending because the number of contingencies that had to happen for a theft to occur kept the risk of harm at a speculative level. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 2014 WL 1858458, at *2, 6 (D.D.C. May 9, 2014).

requirements."  Kerin Br. 16-20.  In both cases, the Second Circuit found standing in the narrow circumstance where plaintiffs sought to compel government agencies to carry out their statutory mandates.

In *Baur*, for example, a divided panel of the Second Circuit limited its holding: in "***the specific context of food and drug safety suits***, … we conclude that claims for [enhanced risk of injury] are cognizable for standing purposes, where the plaintiff alleges exposures to potentially harmful products."  *Id.* at 634 (emphasis added).[13]  Critical to the courts' analysis was that the "very purpose" of the statute that plaintiff was seeking to enforce was "to ensure the safety of the nation's food supply and to minimize the risk to public health from potentially dangerous food and drug products."  *Baur*, 352 F.3d at 634.  Moreover, the *Baur* court found plaintiff "allege[d] a … direct risk of harm which rises above mere conjecture."  *Id.*  The Second Circuit emphasized the fact that "the USDA itself as well as other government agencies have recognized that downed cattle are especially susceptible to [mad cow disease]."  *Id.* at 637.  *See also NRDC*, 710 F.3d at 81-84 (applying *Baur*, plaintiff had standing to compel FDA to finalize regulations of chemical in soap where there was "no genuine dispute" between plaintiff and government that chemical was "potentially harmful" and plaintiff was

---

[13] The majority in *Baur* specifically stated that the court was not deciding whether an "enhanced risk generally qualifies as sufficient to confer standing, nor do we purport to imply that we would adopt such a broad view."  *Id*. at 634.

repeatedly exposed to the chemical at her workplace).[14]

Here, in contrast to *Baur* and *NRDC*, Kerin does not seek to compel

Massachusetts (or Florida) to review CSST's safety or to ban it.  Nor does he cite

government studies that demonstrate any CSST is unreasonably dangerous.  Quite

the contrary, every national and international model code organization,[15] and every

State in the country—including Massachusetts—permits its installation and use.[16]

Kerin's reliance on *Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568 (6th

Cir. 2005), is similarly unavailing.  There, the Sixth Circuit did not decide that ***any***

---

[14] *See also Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d 429, 440
(E.D.N.Y. 2007) (The "'heightened risk" doctrine has only been applied in a
narrow range of cases: those in which an agency's failure to conform to a statutory
mandate has resulted in the plaintiff's exposure to a greater risk of an either
difficult or impossible to remedy injury that the statute explicitly sought to
prevent").

[15] *See* Nat'l Fuel Gas Code (NFPA 54); Int'l Fuel Gas Code § 310.1; Int'l
Residential Code § G2411.1.1.

[16] *See, e.g.*, CAL. CODE REGS. tit. 25, § 4517.4(b) ("Corrugated Stainless Steel
Tubing (CSST) shall be installed in accordance with its listing and labeling.
(California); MD. CODE REGS. 09.20.01.04 ("A gas piping system that contains one
or more segments of CSST without an arc-resistant jacket shall be bonded in
accordance with this section.") (Maryland); 248 C.M.R. 5.03 ("Corrugated
stainless steel tubing systems must be tested and listed in accordance with ANSI/
LC-1-/CSA 6.26 and installed by manufacturer trained, licensed plumbers and gas
fitters.") (Massachusetts); N.Y. COMP. CODES R. & REGS. tit. 19 § 1220.1, 2010
Residential Code of New York State § 310.2 ("Gas piping systems that contains
any … (CSST) … shall be installed and bonded in accordance with Section
G2411.2 of this Code.) (New York); 10-2-24 R.I. CODE R. § 303, Rhode Island
State Building Code § 310.1.1 ("CSST gas piping systems shall be bonded to the
electrical service grounding electrode system.") (Rhode Island).

threat of harm—no matter how remote—confers standing.  Indeed, in one of the principal decisions on which *Sutton* relied, the plaintiffs "demonstrate[d] a 700-percent increase in risk associated with using [an allegedly defective] heart valve."  *Sutton*, 419 F.3d at 575 (citing *In re St. Jude Med., Inc.*, 2003 WL 1589527 (D. Minn. Mar. 27, 2003)).  Although *Sutton* found it unnecessary for a plaintiff to "so clearly" demonstrate her injury, it recognized that one must still "allege[] an increased risk of harm when comparing those individuals implanted with the device to those undergoing traditional surgery."  *Id.* at 575.

But *Sutton* is also fundamentally different than the present case because the plaintiff there sought a medical monitoring fund.  The court's analysis focused on the narrow question of "whether an increased risk of harm ***requiring current medical monitoring*** is a sufficient injury in fact to confer standing."  *Sutton*, 419 F.3d at 571 (emphasis added).  In analyzing standing, the Sixth Circuit recognized that medical monitoring claims are different than monetary damage claims. Quoting *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 850 (3d Cir. 1990), the court recognized that in an enhanced risk case "proving monetary damages 'is inherently speculative because courts are forced to anticipate the probability of future injury' while proving the need for medical monitoring 'is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance.'"  *Sutton*, 419 F.3d at 573.

20

Here, Kerin does not seek monitoring of any sort.  He seeks money damages based on the remote chance that lightning will strike his house and gas will escape from the CSST and cause a fire.  *Sutton* simply does not support standing to assert such a claim.[17]

Because Kerin's alleged injury is abstract, conjectural, and hypothetical, the district court properly dismissed his Complaint for lack of standing.

### 2. Kerin's Purported Overpayment Does Not Suffice to Confer Article III Standing.

Perhaps recognizing that *Clapper* dooms his argument that he faces an imminent risk of harm, Kerin argues he has standing based on overpaying for what he claims to be "a defective product."  Kerin Br. 14-15.  But Kerin cannot end run the "certainly impending" risk requirement by claiming he already incurred an economic injury by overpaying.  Kerin's "overpayment" argument fails for the simple reason that he has not alleged a "certainly impending" risk of harm.  Rather, he alleges he paid for CSST (or a house with CSST) that carries gas to his fireplace and has caused him no harm.  That does not plausibly allege overpayment.

---

[17] Even the *Clapper* dissenters would disagree that *Sutton* supports standing here. Justice Breyer's dissenting opinion cited *Sutton* for the proposition that "courts have often found *probabilistic* injuries sufficient to support standing."  133 S. Ct. at 1163 (emphasis in original).  "[W]hat the Constitution requires," he continued, "is something more akin to 'reasonable probability' or 'high probability.'"  *Id.* at 1165.  Kerin's minuscule probability does not come close to either.

Numerous courts have rejected Kerin's "overpayment" theory as a basis for standing.  In *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 320-21 (5th Cir. 2002), a consumer and the Arkansas Health and Welfare Fund sued Wyeth seeking "to represent all patients who were prescribed, had purchased, and had ingested [a drug Wyeth withdrew from the market] but suffered *no* physical or emotional injury." *Id.* at 317.  The plaintiffs claimed they suffered an injury-in-fact because "they were denied the benefit of the bargain" when they purchased the drug—*i.e.,* that "their loss of cash is an 'economic injury.'" *Id.* at 319-20.  The court rejected the claim because "by plaintiffs' own admission, [the consumer] paid for an effective pain killer, and she received just that—the benefit of her bargain." *Id.*

In *In re Fruit Juice Prods. Mktg. and Sales Practices*, fruit juice manufacturers moved to dismiss consumers' claims that they had purchased products containing trace amounts of lead.  831 F. Supp. 2d 507, 509-10 (D. Mass. 2011).  The manufacturers argued the consumers experienced no adverse health effects; instead they alleged only a risk of future harm from lead poisoning and economic injury for the decreased value of the products.  *Id*.

The court agreed, concluding the purported overpayment for the juice products did not suffice because the consumers were "unable to show that *any* actual harm resulted from consumption of the fruit juice products."  Absent any actual harm, "their allegation of 'economic' injury lack[ed] substance." *Id.* at 512.

22

The plaintiffs bought juice, received juice, and consumed juice "without suffering harm." *Id.* The juice was not recalled and did not fail to comply with federal standards. *Id.* The "allegations only support the contention that the levels of lead in Defendants' products were unsatisfactory to them. This allegation is simply insufficient to support a claim for injury in fact." *Id.* at 513; *see also Koronthaly v. L'Oreal USA Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (affirming district court's dismissal for lack of standing where the plaintiff did not allege "she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect").

Kerin tries to distinguish *In re Fruit Juice* and *Koronthaly* on grounds that the products' useful life in those cases was exhausted and that the plaintiffs "fail[ed] to substantiate allegations of a credible risk." Kerin Br. 15. But the court in *In re Fruit Juice* made clear that consumers' allegations of overpayment were insufficient because their "claims of risk of future harm" were "too speculative" for economic damages, not—as Kerin contends—merely because the juice's useful life was over. 831 F. Supp. 2d at 512-13. And even if a consumer went one step further and responded to the alleged risk of harm by making an economic expenditure to protect against it, there is still no standing where the alleged risk of harm remains speculative. *See Clapper*, 133 S. Ct. at 1151 (no standing where plaintiffs "incurred certain costs as a reasonable reaction to a risk of harm" because

23

"the harm [plaintiffs] seek to avoid is not certainly impending"); *Reilly*, 664 F.3d at 46 (economic "expenditures to monitor their financial information" as a result of the defendant's alleged actions "do not establish standing, because costs incurred to watch for a speculative change of future events … are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for Appellant's claims.").

As Judge Ponsor held here, *see* RA37, Kerin did not come close to "substantiat[ing] allegations of a credible risk."  Kerin Br. 15.  On the contrary, Kerin posited a highly attenuated chain of events that—even assuming each event occurred—still might not cause harm.  To accept Kerin's argument that allegations of economic harm are sufficient to confer standing when the product performs its intended function—***no matter how remote the underlying risk of harm***—would vitiate the standing requirement.

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) and *Cole v. General Motors Corp.*, 484 F.3d 717, 722-23 (1st Cir. 2007), cases on which Kerin relies, *see* Kerin Br. 14-15, are easily distinguished.  *Mazza* did not involve a risk of harm.  Rather, in *Mazza*, where the court reversed an order granting class certification, *id.* at 596, the plaintiffs alleged that Honda misrepresented certain characteristics of an optional advanced braking system that cost $4,000.  *Id.* at 586. The plaintiffs alleged they suffered harm because they relied upon the misleading

24

statements and purchased the braking system.  *Id*. at 595-96.  The case thus has no applicability here.

Kerin does not allege he suffered harm because he purchased CSST, or a home with CSST in it, based on a representation Titeflex made.  And unlike here, the *Mazza* plaintiffs substantiated their allegations that Honda misrepresented those characteristics and alleged a defect that, if it existed, would plausibly compromise the braking system and reduce the car's value.  *Id.* at 595 (to "the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact").

And while the *Cole* court found that plaintiffs had standing to seek recovery for economic harm based upon the purchase of an allegedly defective car, the risk of harm in *Cole* was essentially conceded.  The car owners had standing because GM acknowledged the alleged defect and undertook a voluntary recall after receiving reports that airbags were inadvertently deploying.  *Cole*, 484 F.3d at 718-20, 723.

Here, Kerin failed to allege any facts to support a "certainly impending" risk of harm.  Without more, his conclusory allegation of a hypothetical overpayment does not plausibly allege that he, in fact, suffered an economic injury.

In short, the Court should affirm the dismissal of Kerin's Complaint under Rule 12(b)(1) because he suffered no harm and faces no imminent risk of harm.

25

### 3. The Invasion of a State-Created Legal Right Alone Is Insufficient for Article III Standing.

Kerin wrongly argues that asserting a cause of action under state law satisfies Article III's standing requirement. Kerin Br. 11-13.

A plaintiff must have constitutional standing to invoke the authority of an Article III court. *In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 29-30 (D. Mass. 2008). The standing requirement applies no less when a state cause of action is asserted. Thus, to have standing in a diversity case, a plaintiff must satisfy both state ***and*** federal standing requirements. *See, e.g.*, *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005) ("Where [ ] jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action"); *Comer v. Murphy Oil USA*, 585 F.3d 855 (5th Cir. 2009) ("Because this is a diversity case involving state common-law rights of action, plaintiffs must satisfy both state and federal standing requirements."); *Cantrell v. City of Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001) ("California's lenient taxpayer standing requirements do not relieve the [plaintiffs] of the obligation to establish direct injury under the more stringent federal requirements"); *Metropolitan Express Servs., Inc. v. City of Kansas City, Mo.*, 23 F.3d 1367, 1369 (8th Cir. 1994) (same).

26

Accordingly, even if a diversity plaintiff has standing under state law, its claim must be dismissed if Article III standing is lacking. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) ("Standing to sue in any Article III court is, of course, a federal question which does not depend on the party's [ ] standing in state court."); *Goode v. City of Philadelphia*, 539 F.3d 311, 321 (3d Cir. 2008) (same). Indeed, in *Katz*, this Court recognized that before it could consider statutory standing, it must first assess "whether the plaintiff has demonstrated Article III standing. Only if the plaintiff has cleared this hurdle will we proceed to examine whether she has adequately alleged her membership in the class of persons who can bring suit under Massachusetts consumer protection laws." 672 F.3d at 76. Similarly, in *Rule v. Fort Dodge Animal Hosp., Inc.*, the court observed that "to the degree [the Massachusetts consumer protection statute] case law is read to elide an actual injury requirement from the statute, the federal courts, operating under federal constitutional standing obligations, may be without jurisdiction to entertain [those] cases in which the private plaintiff suffered no actual harm." 604 F. Supp. 2d 288, 306 (D. Mass. 2009).

Kerin cannot rely solely on an alleged violation of state law to satisfy Article III. And even if merely asserting a state-law claim satisfied Article III's standing requirement, as discussed below, Kerin has alleged no valid claims for relief under Massachusetts law.

27

**B.    The District Court Properly Dismissed the Complaint Because It Fails to Sufficiently Plead a Cognizable Injury Under Massachusetts Law.**

Even if Kerin were deemed to have Article III standing (which he does not), none of his claims alleges the circumstances under which a claim for purely economic loss is a legally cognizable injury.

The district court correctly held that, under Massachusetts law, where a plaintiff seeks purely economic loss for an allegedly defective product that has not malfunctioned, the plaintiff must allege the product fails to meet a standard "legally required by and enforced by the government."  The district court explained:

> [A] further fatal defect in Plaintiff's claim is the utter absence of any allegation of an applicable standard against which [Defendant's] due care[18] could be measured.  The Supreme Judicial Court has recognized claims for economic injury stemming from a defective product, but only where "the standard that a product allegedly fails to meet is … one legally required by and enforced by the government."  *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 633 (2008).  Plaintiff concedes that the CSST in question does not violate any applicable regulatory standard.

RA38-39.

In *Iannacchino*, the Supreme Judicial Court addressed the type of alleged

---

[18] The district court's opinion says "against which Plaintiff's due care could be measured"—but the context of the sentence suggests that the court likely intended to say "against which ***Defendant's*** due care could be measured."

28

economic harm Kerin is asserting here: namely, the purchase of a product said to be defective and potentially dangerous but that has not caused any physical harm or property damage to the plaintiff.  The *Iannacchino* plaintiffs owned Ford vehicles with allegedly defective door handles that "might open accidentally in certain types of collisions, putting vehicle occupants at risk of significant personal injury or death."  451 Mass. at 626.  Plaintiffs did not allege that the door latches had ever malfunctioned, but that the latches were noncompliant with federal vehicle safety standards.  *Id*. at 624.  Like Kerin, they alleged that their injury was overpaying for the allegedly defective product.  *Id*. at 629-33.

The Supreme Judicial Court held that the *Iannacchino* plaintiffs failed to state a cognizable claim under Massachusetts law for two reasons.  First, the court held that the plaintiffs did not assert any facts to support their conclusory allegations that the vehicles did not comply with federal vehicle safety standards.  *Id*. at 631-32.  Second, to the extent the complaint could be construed to assert claims of any defect not connected to "a legally required standard[,]" the court held that plaintiffs' claim of economic injury based on overpayment failed to assert a cognizable injury.  *Id*. at 632-33.

Of particular significance here, the Supreme Judicial Court concluded that, if the *Iannacchino* plaintiffs **had** adequately alleged noncompliance with a federal vehicle safety standard, their allegation of overpaying for the vehicle "would

29

represent an economic loss—measurable by the cost to bring the vehicles into

compliance—for which the plaintiffs could seek redress" under Massachusetts law.

*Id.* at 631. But in the absence of an adequate allegation of regulatory

noncompliance, the claimed overpayment was not a legally cognizable injury.

The court explained:

> Where, as in this case, there is no allegation that the
> plaintiffs—or indeed anyone else—have suffered
> personal injury or property damage, the complaint must
> identify a legally required standard that the vehicles were
> at least implicitly recognized as meeting, but allegedly
> did not. ***When the standard that a product allegedly
> fails to meet is not one legally required by and enforced
> by the government, a claim of economic injury based on
> overpayment lacks the premise that the purchase price
> entitled the plaintiffs to a product that met that
> standard***.

*Id.* at 633 (emphasis added). *Accord Watkins v. Omni Life Science, Inc.*, 692

F. Supp. 2d 170, 176 & n.7 (D. Mass. 2010) (recipients of artificial hip implant

alleging a "relatively high rate of failure of the [implant] place[d] them and

members of the proposed class at serious risk of future harm" and "diminished the

market value of their hip implants" failed to plead a cognizable injury; citing

*Iannacchino*, the court held "Plaintiffs' overpayment argument is … based on a

theory of economic loss that has no place in a tort context").

The district court thus correctly identified this deficiency in Kerin's

Complaint as an additional reason why the Complaint should be dismissed.

Kerin argues that the district court "misconstrued" Massachusetts law when it found the absence of a regulatory standard to be "'a further fatal flaw.'"  Kerin Br. 22.  Pointing to his allegations of a report of 141 fires "involving lighting and CSST" and two expert reports concerning alleged risks associated with CSST, he contends that "Massachusetts courts allow purchasers to sue for economic damages based upon dangerously defective products *when they allege objective corroboration of the safety risk*, which Kerin has done.  The absence of a regulatory standard is immaterial."  *Id.* at 22-25 (emphasis added).

This argument is simply wrong.  Kerin cites no case that applied this broad standard, and the Supreme Judicial Court did *not* adopt it in *Iannacchino*.  Indeed, there was evidence in *Iannacchino* that could suffice as an "objective corroboration of a safety risk"—an internal Ford memorandum that acknowledged the safety risk and proposed a recall, *see* 451 Mass. at 626—but the Supreme Judicial Court upheld dismissal because there was no adequate allegation that the door latches violated any legally required government safety standard.  *Id.* at 629-35.  And in *Watkins*, allegations that the artificial hip had a relatively high failure rate (*i.e.*, some other recipients' hip implants had failed), *see* 692 F. Supp. 2d at 173, did not prevent Judge Stearns from dismissing the plaintiffs' overpayment claim under *Iannacchino*.

The three cases Kerin relies upon—*Commonwealth v. Johnson Insulation*,

31

425 Mass. 650 (1997); *Ashley v. Boch Toyota, Inc.*, 1992 WL 41980

(Mass. App. Div. Mar. 4, 1992); and *Holtzman v. General Motors Corp.*, 2002 WL

1923883 (Mass. Sup. Ct. July 2, 2002)—do not support his argument.  First, none

of them adopts the "objective corroboration of the safety risk" pleading standard

that Kerin claims is the law in Massachusetts.  Second, in *Commonwealth v.*

*Johnson Insulation*, the Supreme Judicial Court expressly stated that the claims for

asbestos abatement costs involved allegations of actual property damage, which are

absent here, *see* 425 Mass. at 664-67; *see also Iannacchino*, 451 Mass. at 634

(*Johnson* involved "claims of injury in form of property damage").  Third, both

*Ashley* and *Holtzman* are Massachusetts lower court decisions that pre-date

*Iannacchino*.  *See*, *e.g.*, *Watkins*, 692 F. Supp. 2d at 177 ("It seems more likely that

*Holtzman* would have been decided differently in the wake of *Iannacchino*.").

The district court correctly assessed the sufficiency of the allegations in

Kerin's Complaint against the requirements the Supreme Judicial Court established

in *Iannacchino* and properly determined that the lawsuit should be dismissed (even

assuming he had standing) because Kerin failed to adequately plead a cognizable

injury under Massachusetts law.

### C.    The Economic Loss Rule Bars Kerin's Claims.

Each of Kerin's four claims was properly dismissed because each is barred

by the economic loss rule.  The Massachusetts Supreme Judicial Court has

repeatedly reaffirmed the "long-standing rule" that "purely economic losses are unrecoverable *in tort and strict liability actions* in the absence of personal injury or property damage." *FMC Corp. v. Boston Edison Co.*, 415 Mass. 393, 395 (1993) (emphasis added) (citing cases). These are precisely the types of claims Kerin asserted in his Complaint. *See* RA25-29.

Economic loss includes "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property." *Marcil v. John Deere Indus. Equip. Co.*, 9 Mass. App. Ct. 625, 630 n.3 (1980) (quotation marks and citation omitted). The economic loss rule bars tort claims seeking damages for only economic losses, without any claim of personal injury or damage to other property (*i.e.*, damage to property other than the product itself). *E. River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 871 (1986); *Sebago, Inc. v. Beazer East, Inc.,* 18 F. Supp. 2d 70, 89 (D. Mass. 1998). To seek damages of that kind, one must turn to contract or warranty law, not tort law.

Federal courts applying Massachusetts law have repeatedly dismissed tort claims absent allegations of personal injury or harm to other property. *See, e.g.*, *Rule*, 604 F. Supp. 2d at 292-93 (dismissing the plaintiff's products liability and failure to warn claim where she failed to allege any physical injury or harm to other property), *aff'd on other grounds*, 607 F.3d 250 (1st Cir. 2010); *Lewis v.*

33

*Gen. Elec. Co.*, 37 F. Supp. 2d 55, 59 (D. Mass. 1999) (dismissing negligence and strict liability claims where landowner alleged other properties in her neighborhood were contaminated with PCBs, causing a diminution in the value of her home, but did not allege her property was contaminated).

Here, Kerin asserts only tort claims, and they all seek recovery of economic damages. Nowhere does Kerin allege personal injury or damage to his property. Rather, he seeks to recover the cost of removing and replacing the allegedly defective CSST in his home. *See* RA9-10 ¶ 9 ("Gastite® is defective, should never have been sold, and needs to be removed and replaced from all structures"). He alleges he and the putative class "are forced to repair and/or replace Gastite®," but have not been reimbursed "or advanced the costs associated with this undertaking." RA22 ¶ 62. His claims fall squarely within the economic loss rule.

Because Kerin does not allege the CSST in his home caused personal injury or harm to other property, his claims, all of which are based in tort, are barred by the economic loss rule.

### D.    Kerin's Strict Liability Claims Were Properly Dismissed Because Massachusetts Does Not Recognize the Tort of Strict Liability Apart From Breach of Warranty.

Counts I and IV of the Complaint assert claims for strict liability in tort. In Count I, Kerin alleges strict liability under a design and manufacturing defect theory; in Count IV, he alleges strict liability under a failure to warn theory. *See*

RA25-26 and 29.  But Massachusetts does not recognize either claim, and, accordingly, both claims were properly dismissed.

This Court has explained that "[t]here is no 'strict liability in tort' action recognized by Massachusetts law apart from liability for breach of warranty under the Uniform Commercial Code."  *Smith v. Robertshaw Controls Co.*, 410 F.3d 29, 35 & n.4 (1st Cir. 2005) ("Massachusetts does not recognize strict products liability in tort.").  *See also Mason v. Gen. Motors Corp.*, 397 Mass. 183, 191 (1986) (Legislature created statutory remedy for breach of warranty and "[w]e are unwilling … to hold today that, apart from liability for breach of warranty under our statute, there may be liability without fault for defective products.").  Kerin's strict liability claims, therefore, "fail[] as a matter of law."  *See Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372, 380-81 (D. Mass. 2008) (citing *Swartz v. Gen. Motors Corp.*, 375 Mass. 628, 631 (1978)).

## VII.  **CONCLUSION**

Judge Ponsor properly dismissed Kerin's Complaint for lack of Article III standing because the highly attenuated chain of events here is simply too speculative.  The district court also correctly dismissed the Complaint on the additional basis that none of the four counts in the Complaint satisfies the requirements the Massachusetts Supreme Judicial Court adopted in *Iannacchino*. All of Kerin's claims are also barred by the economic loss rule, and his strict

liability tort claims must be dismissed because they are not recognized under

Massachusetts law.


Dated:  June 9, 2014                          /s/  Jodi K. Miller
                                              Jeffrey E. Poindexter
                                              Jodi K. Miller
                                              Bulkley Richardson and Gelinas, LLP
                                              1500 Main Street, Suite 2700
                                              Springfield, MA 01115-5507
                                              Tel.:  (413) 781-2820
                                              Fax:  (413) 785-5060

                                              *Co-Counsel:*

                                              Charles B. Casper
                                              John G. Papianou
                                              Montgomery, McCracken,
                                               Walker & Rhoads, LLP
                                              123 South Broad Street
                                              Philadelphia, Pennsylvania 19109
                                              Tel.:  (215) 772-1500
                                              Fax:   (215) 772-7620

                                              *Attorneys for Defendant-Appellant*
                                              *Titeflex Corporation t/a Gastite*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,707 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Times New Roman 14 point font in Microsoft Word.

Dated:  June 9, 2014

/s/  Jodi K. Miller
Jeffrey E. Poindexter
Jodi K. Miller
Bulkley Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel.:  (413) 781-2820
Fax:  (413) 785-5060

*Co-Counsel:*

Charles B. Casper
John G. Papianou
Montgomery, McCracken,
  Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, Pennsylvania 19109
Tel.:   (215) 772-1500
Fax:   (215) 772-7620

*Attorneys for Defendant-Appellant*
*Titeflex Corporation t/a Gastite*

37

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the U.S. Court of Appeals for the First Circuit using the appellate

CM/ECF system on June 9, 2014.  I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished electronically by

the appellate CM/ECF system upon the following counsel for Plaintiff-Appellant

Tim Kerin:

> Kevin T. Peters, Arrowood Peters LLP (kpeters@arrowoodpeters.com)
> Erika Todd, Arrowood Peters LLP (etodd@arrowoodpeters.com)


Dated:  June 9, 2014                    /s/  Jodi K. Miller
                                        Jeffrey E. Poindexter
                                        Jodi K. Miller
                                        Bulkley Richardson and Gelinas, LLP
                                        1500 Main Street, Suite 2700
                                        Springfield, MA 01115-5507
                                        Tel.:  (413) 781-2820
                                        Fax:  (413) 785-5060

                                        *Co-Counsel:*

                                        Charles B. Casper
                                        John G. Papianou
                                        Montgomery, McCracken,
                                          Walker & Rhoads, LLP
                                        123 South Broad Street
                                        Philadelphia, Pennsylvania 19109
                                        Tel.:  (215) 772-1500
                                        Fax:  (215) 772-7620

                                        *Attorneys for Defendant-Appellant*
                                        *Titeflex Corporation t/a Gastite*

38

## <u>DEFENDANT-APPELLEE'S ADDENDUM</u>

248 C.M.R. 4.00…………………………………………………………………………40

248 C.M.R. 4.01…………………………………………………………………………41

248 C.M.R. 4.02…………………………………………………………………………42

248 C.M.R. 4.03…………………………………………………………………………43

248 C.M.R. 5.00…………………………………………………………………………49

248 C.M.R. 5.01…………………………………………………………………………50

248 C.M.R. 5.03…………………………………………………………………………51

Massachusetts Board of State Examiners of Plumbers and Gas Fitters,
    Product Policy Regarding Corrugated Stainless Steel Tubing (CSST)
    (February 4, 2009) ……………………………………………………………..60

**MA ADC T. 248, Ch. 4.00, Refs & Annos, MA ADC T. 248, Ch. 4.00, Refs & Annos**

Code of Massachusetts Regulations Currentness
    Title 248: Board of State Examiners of Plumbers and Gas Fitters
        Chapter 4.00: Introduction and Massachusetts Modifications

CMR T. 248, Ch. 4.00, Refs & Annos

REGULATORY AUTHORITY

248 CMR 4.00: M.G.L. c. 112, § 61; M.G.L. c. 142, §§ 13 and 21.

Current through May 23, 2014, Register #1261

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**4.01: Scope and Purpose, 248 MA ADC 4.01**

Code of Massachusetts Regulations <sup>Currentness</sup>
    Title 248: Board of State Examiners of Plumbers and Gas Fitters
        Chapter 4.00: Introduction and Massachusetts Modifications (Refs & Annos)

248 CMR 4.01

4.01: Scope and Purpose

248 CMR 4.00 governs the Board's adoption of the ANSI Z223.1-2002 NFPA-54-2002 National Fuel Gas Code 2002 Edition and NFPA 58 Liquefied Petroleum Gas Code 2001 Edition and the modifications which comprise the Massachusetts Fuel and Gas Code.

Current through May 23, 2014, Register #1261

Mass. Regs. Code tit. 248, § 4.01, 248 MA ADC 4.01

**End of Document**                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**4.02: Definitions, 248 MA ADC 4.02**

Code of Massachusetts Regulations <sup>Currentness</sup>
  Title 248: Board of State Examiners of Plumbers and Gas Fitters
    Chapter 4.00: Introduction and Massachusetts Modifications (Refs & Annos)

248 CMR 4.02

<u>4.02: Definitions</u>

As used in 248 CMR 4.00 through 7.00.

<u>NFPA-54</u>. The ANSI Z223.1-2002 NFPA-54-2002 National Fuel Gas Code 2002 Edition.

<u>NFPA-58</u>. The NFPA 58 Liquefied Petroleum Gas Code 2001 Edition.

Current through May 23, 2014, Register #1261

<u>Mass. Regs. Code tit. 248, § 4.02, 248 MA ADC 4.02</u>

**End of Document**                                               © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**4.03: Adoption of Relevant Codes and Overview of Modifications, 248 MA ADC 4.03**

Code of Massachusetts Regulations <sup>Currentness</sup>
  Title 248: Board of State Examiners of Plumbers and Gas Fitters
    Chapter 4.00: Introduction and Massachusetts Modifications (Refs & Annos)

248 CMR 4.03

<u>4.03: Adoption of Relevant Codes and Overview of Modifications</u>

(1) <u>Adoption of Relevant Codes</u>: The Massachusetts Fuel Gas Code shall be:

(a) The ANSI Z223.1-2002 NFPA-54-2002 National Fuel Gas Code 2002 Edition as modified in 248 CMR 4.00 and 248 CMR 5.00. A copy of ANSI Z223.1-2002 NFPA-54-2002 National Fuel Gas Code 2002 Edition may be obtained from any national bookstore chain.

(b) The NFPA 58 Liquefied Petroleum Gas Code 2001 Edition as modified in 248 CMR 4.00. A copy of NFPA 58 Liquefied Petroleum Gas Code 2001 Edition may be obtained from any national bookstore chain.

(c) 248 CMR 7.00 Massachusetts Code for Gas Utilization Equipment in Large Boilers.

(2) <u>Overview of Modifications</u>.

(a) <u>Order of Precedence</u>:

1. 248 CMR 3.00 through 10.00 shall take precedence when there is a conflict between 248 CMR 3.00 through 10.00 and the NFPA-54.

2. 248 CMR 3.00 through 10.00 shall take precedence when there is a conflict between 248 CMR 3.00 through 10.00 and the NFPA-58.

3. In the event of a conflict between the 2002 Edition of NFPA-54-ANSI Z223.1 National Fuel Gas Code as modified in 248 CMR 4.00 and 248 CMR 5.00 and the 2001 Edition of the NFPA 58 Standard for the Storage and Handling of Liquefied Petroleum Gases as modified in 248 CMR 4.00, the 2002 Edition of NFPA-54-ANSI Z223.1 National Fuel Gas Code with the modifications made in 248 CMR 4.00 and 5.00 shall take precedence over the 2001 Edition of the NFPA 58 Standard for the Storage and Handling of Liquefied Petroleum Gases with the modifications in 248 CMR 4.00.

(b) <u>Modifications to NFPA 58</u>--NFPA 58--2001 Standard for the Storage and Handling of Liquefied Petroleum Gases shall be modified as follows:

1. Chapters 1, 2, and 3 as they apply to the use of Liquefied Petroleum Gas Systems not covered in NFPA-54-ANSI Z223.1, 2002 have been adopted as the Code governing these systems.

2. Reference to Storage Containers in Chapters 1, 2, and 3 are not adopted by the Board given that FPR 527 CMR 6.00 governs Storage Containers.

3. Reference to Engine Fuel Systems and LP-Gas Systems on Vehicles in Chapter 3 are not adopted by the Board.

(c) NFPA-54- ANSI Z223.1--2002 the National Fuel Gas Code shall be modified as follows:

**4.03: Adoption of Relevant Codes and Overview of Modifications, 248 MA ADC 4.03**

1. Delete pages i through iv and substitute the following:

In accordance with the provisions of M.G.L. c. 142, § 13, the Board makes the following rules and regulations relative to the installation of fuel gas piping systems, fuel gas utilization equipment, and related accessories throughout the Commonwealth.

Nothing in 248 CMR 3.00 through 7.00 shall conflict with the provisions of 220 CMR Department of Telecommunication and Energy 100.00 through 113.00 of the Massachusetts Gas Distribution Code and nothing in 248 CMR shall supersede or overrule any of the provisions of M.G.L. c. 142 or any code, rules, or regulations established under the authority of M.G.L. c. 142.

Rule 1. Gas piping systems, in general, shall be low pressure (not in excess of ½ pound per square inch or 14 inches water column).

Rule 2. The requirements of 248 CMR 3.00 shall apply to all gas fitting work performed in the Commonwealth.

Rule 3. In cases of emergency a gas appliance may be turned on temporarily by the licensed installer provided:

a. the installer has tested the piping in accordance with the appropriate section of 248 CMR;

b. the installer and the supplier are satisfied that the installation of piping and use of the equipment will assure safe operation; and

c. the Inspector (or the chief inspector if more than one inspector) is notified and a regular Inspection is made at the earliest opportunity but not later than the next working day.

Rule 4. Undiluted Liquefied Petroleum Gas: (Propane Gas)

a. No deliveries of propane gas shall be made to any new or altered gas piping installation without the supplier first ascertaining whether the Inspector has approved the permit and Inspected the installation.

b. Alterations or additions to the original gas piping installation shall require re-approval and issuance of new permits.

Rule 5. Each trailer that is used in any way for human occupancy and incorporates a gas piping system shall be inspected by the Inspector in every location and relocation where such trailer is in use and reconnected to a fuel gas source that is regulated by 248 CMR 3.00 through 7.00.

Rule 6. For the purpose of 248 CMR, the Inspector shall be either the Local or State Inspector as determined under 248 CMR 3.00.

Rule 7. An amendment to Title 49 CFR, Code of Federal Regulations Part 192, Subpart A - General Section 192.3 Definitions of the minimum Federal Safety Standards relating to transportation of Natural Gas and other Gas by Pipeline redefine a service line to mean a distribution line that transports gas from a common source to:

a. A customer meter or the connection to a customer's piping, whichever is farther downstream; or

b. The connection to a customer's piping if there is no customer meter. A customer meter is the meter that measures the transfer of gas from an operator to a customer.

Rule 8. Exception to Permit Requirements of 248 CMR 3.00. No permit shall be required for:

a. The adjusting of gas appliance controls, the adjusting of gas flames, the replacement of gas controls, the

installation or replacing of gas meters and regulators, and the servicing of gas appliances shall be deemed work for which no permit shall be required.

b. The restoration of gas service after a gas meter or meter fit is relocated under the following rules:

i. The work shall be done by authorized employees of gas companies organized under M.G.L. c. 164.

ii The required gas piping reconnection shall not exceed ten feet.

iii. The gas piping reconnections shall be labeled by the installing gas company.

Rule 9. Gas shall not be turned on to a new or existing system, which has been renovated unless the installation has been Inspected and approved by the Inspector as required under 248 CMR 3.00.

Rule 10. Whenever there is reason to believe that the gas system of any building or structure has become defective, it shall be subjected to test and/or Inspections, any defects found shall be corrected as required in writing by the Inspector.

Rule 11. Whenever additional gas piping connections or alterations thereof are being made or installed in existing buildings or premises, and existing gas fitting is found to be in violation of 248 CMR to the point of being a health menace, nuisance or a safety hazard, such existing gas fitting shall be made compliant with 248 CMR 3.00 through 7.00 before any additional work may be completed.

Rule 12. In addition to the requirements of 248 CMR 3.00 through 7.00, when gas equipment, which is connected to a gas system, is to be permanently removed and/or replaced, a permit for the work shall be secured. All connections to such equipment shall be made gas tight by use of a plug or cap.

Rule 13. Should a licensed plumber or gas fitter holding a gas permit for installation of gas work turn on gas to such work without first notifying the Inspector, he may not be granted any further gas permits upon the discretion of the Inspector.

Rule 14. Surveyed. Prior to the commencement of work, all portions of existing systems that are directly affected by proposed gas fitting work shall be surveyed by the licensed plumber or gas fitter to insure that the existing work is adequate to support the proposed work.

Rule 15. In the case of a fire or explosion involving facilities or buildings regulated by the Board, the Inspector shall in reasonable detail promptly notify the Board and the Serving Gas Supplier. The Inspector or authorized agent of the State Fire Marshall shall impound any gas piping or gas equipment involved in the incident which in his or her opinion contributed in any way to the explosion or fire.

Rule 16. Utility Gas and Undiluted Liquefied Petroleum Gas systems within the same building:

a. Utility gas and L.P. gas systems shall not be installed within the same building except where the Board has first granted Special-Permission under 248 CMR 3.00.

b. When the two gas systems are installed within the same building, the natural gas piping system shall be color-coded yellow and the L. P. gas piping system colored green.

c. Labeling: The gas piping systems shall be labeled:

i. at a minimum of every ten feet;

ii. at all changes of direction;

iii. on each side of a penetration through a partition, wall or ceiling; and,

iv. at every gas shutoff valve.

v. The labels shall be:

(i) colored yellow with black lettering, indicating the type of gas and the pressure contained within the piping system, and

(ii) the letters shall be sized so that the labeling can be read from a normal line of vision when standing at the main floor level.

Rule 17. The Limited Liquefied Petroleum Gas Installer shall be responsible for the gas permits when installing, connecting, and moving liquefied petroleum gas salamanders, space heaters and related equipment used in buildings under construction.

Rule 18. A secondary meter assembly from utility gas companies is allowed down stream of a master meter subject to all permits, testing, rules, and regulations.

Rule 19. Gas piping systems, for gas utilization equipment over 12,500,000 BTU/hour and water tube boilers having outputs of 10,000 pounds of steam per hour or more require:

a. that Special-permission by the Board be obtained before installation.

b. That the plans bear the seal of a Massachusetts Registered Professional Engineer.

c. That accompanying the plans is a letter from the servicing gas supplier indicating that the fuel supply is available.

Rule 20. Gas piping systems for cogeneration facilities require:

a. Special-permission from the Board prior to installation.

b. That the plans bear the seal of a Massachusetts Registered Professional Engineer.

c. That accompanying the plans is a letter from the servicing gas supplier indicating that the fuel supply is available.

Rule 21. Repairs and Alterations.

a. In existing buildings or premises where gas piping installations are to be altered, replaced, repaired, or renovated, deviations from the provisions of 248 CMR 3.00 through 7.00 are permitted, provided such deviations are found to conform to the intent of 248 CMR 3.00 through 7.00, and are approved by the Inspector.

b. Whenever compliance with the provisions of 248 CMR 3.00 through 7.00 fails to eliminate or alleviate a nuisance which may involve health or safety hazards, the owner or his or her agent shall install such additional gas utilization equipment as may be found necessary by the Inspector.

c. The intent of 248 CMR 4.03 Rule 21a. and b. shall apply only when a hardship occurs due to mechanical or structural limitations, and when extreme circumstances warrant special terms or conditions in the opinion of the Inspector and the servicing gas supplier.

i. Deviations from the provisions of the code may be permitted in existing building or premises where gas fitting installations are to be altered, repaired, or renovated. The deviations shall be negotiated by the permit holder and

**4.03: Adoption of Relevant Codes and Overview of Modifications, 248 MA ADC 4.03**

the Inspector prior to the installation. The deviations may be allowed provided that the deviations are found necessary and conform to the scope and intent of 248 CMR.

ii. Whenever the work subject to a permit complies with the provisions of 248 CMR 3.00 through 10.00, but the Inspector notes other existing plumbing or gas fitting that may cause a health or safety hazard, the Inspector shall notify the owner of the hazard in writing.

Rule 22. For gas utilization equipment in boilers or with burners having inputs that exceed 400,000 BTU/hour per combustion chamber refer to 248 CMR 7.00, Massachusetts Code for Gas Utilization Equipment in Large Boilers.

Rule 23. Work on a gas supply systems at a point upstream of the outlet of the meter set assembly or the service regulator when a meter is not provided:

a. Serving Gas Supplier. No person, unless in the employment of or having permission from the serving gas supplier, shall open or make connections with a gas distribution main.

b. Service Gas Piping. When a gas meter is not provided, no persons, unless in the employment of or having permission from the serving gas supplier, shall:

i. repair,

ii. alter,

iii. open or make connections to the service gas piping, or

iv. do any other work on the parts of the gas supply distribution system up to and including the meter set assembly, or the service regulator.

c. Meter or Service Regulator When a Meter is not Provided.

i. No person, unless in the employment of or having permission from the serving gas supplier, shall disconnect the inlet of the gas meter, or service regulator when a meter is not provided, or move such a meter or regulator.

ii. A gas fitter or plumber may disconnect the piping from the outlet side of such a meter or regulator. He or she shall remake the joint at the meter, or service regulator outlet when a meter is not provided, carefully replacing all insulating fittings or insulating parts of such fittings, and shall leave the gas turned off at the meter or regulator.

d. Notify Serving Gas Supplier of Any Repairs Needed. In the case of any work performed by a gas fitter or plumber that discloses the need for repairs or alterations on any part of the gas supply system, the serving gas supplier shall be notified promptly of this fact.

e. Notify Serving Gas Supplier of Any Leaks. If gas is leaking from any part of the gas supply system, a gas fitter or plumber not in the employment of the serving gas supplier may make the necessary repairs and shall promptly notify the Inspector and serving gas supplier.

Rule 24. The Board must certify the installer of a field installed automatic gas vent damper.

Rule 25. Penalties and Appeals.

a. Penalty. *See* 248 CMR 3.00 for penalty provisions.

b. Appeal Procedure. *See* 248 CMR 3.00 for appeal procedure.

**4.03: Adoption of Relevant Codes and Overview of Modifications, 248 MA ADC 4.03**

Current through May 23, 2014, Register #1261

Mass. Regs. Code tit. 248, § 4.03, 248 MA ADC 4.03

**End of Document**                                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

48

**MA ADC T. 248, Ch. 5.00, Refs & Annos, MA ADC T. 248, Ch. 5.00, Refs & Annos**


Code of Massachusetts Regulations <sup>Currentness</sup>
    Title 248: Board of State Examiners of Plumbers and Gas Fitters
        Chapter 5.00: Amendments to 2002 Edition of Ansi Z223.1-nfpa-54

CMR T. 248, Ch. 5.00, Refs & Annos

REGULATORY AUTHORITY

248 CMR 5.00: M.G.L. c. 112, § 61; M.G.L. c. 142, §§ 13 and 21.


Current through May 23, 2014, Register #1261

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**5.01: Scope and Purpose, 248 MA ADC 5.01**

Code of Massachusetts Regulations Currentness
   Title 248: Board of State Examiners of Plumbers and Gas Fitters
      Chapter 5.00: Amendments to 2002 Edition of Ansi Z223.1-nfpa-54 (Refs & Annos)

248 CMR 5.01

5.01: Scope and Purpose

248 CMR governs the Board's modifications to NFPA-54.

Current through May 23, 2014, Register #1261

Mass. Regs. Code tit. 248, § 5.01, 248 MA ADC 5.01

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03**

Code of Massachusetts Regulations Currentness
   Title 248: Board of State Examiners of Plumbers and Gas Fitters
      Chapter 5.00: Amendments to 2002 Edition of Ansi Z223.1-nfpa-54 (Refs & Annos)

248 CMR 5.03

5.03: Modifications to sections of NFPA-54, Chapter 5

(1) Revise NFPA-54 section 5.1.1 as follows:

   Permits and Piping Plans.

   (a) In addition to the permit requirements of 248 CMR 3.05, for gas installations of over 5,000,000 BTU/Hr the following is required:

      1. A plan of the proposed piping system and equipment shall be submitted for approval to the Inspector.

      2. This plan shall contain a written statement from the local gas supplier that such fuel demand is available.

      3. The system shall be designed by a Registered Professional Engineer.

   (b) Gas piping systems requiring gas pressure in excess of ½ P.S.I.G. require Special-permission of the Board before being installed. This Special-permission requirement does not apply to propane gas piping systems that are between the first and second stage regulator if the second stage regulator is located outside the building.

(2) Revise NFPA-54 section 5.4.2.1 by adding a last sentence and table as follows:

   Diversity factor is an important factor determining the correct gas piping size to be used for supplying domestic ranges in multiple family dwellings; it applies to domestic ranges only and shall not apply to any other gas appliances.

**TABLE Multi-Family Dwellings Diversity Factor in Percent of Total Load for Domestic Gas Ranges with connected Load Ratings of 63,000 Btu/hr. or more per Range**

| No. of Ranges | Demand cubic ft/hour | Percent of Rating | No. of Ranges | Demand cubic ft/hour | Percent of Ratings |
|---|---|---|---|---|---|
| 1 | 63 | 100 | 13 | 270 | 33 |
| 2 | 107 | 85 | 14 | 283 | 32 |
| 3 | 132 | 70 | 15 | 293 | 31 |
| 4 | 151 | 60 | 16 | 312 | 31 |
| 5 | 173 | 55 | 17 | 332 | 30 |

5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03

| 6 | 189 | 50 | 18 | 340 | 30 |
| 7 | 198 | 50 | 19 | 346 | 29 |
| 8 | 212 | 42 | 20 | 353 | 28 |
| 9 | 225 | 39 | 21 | 358 | 27 |
| 10 | 233 | 31 | 22 | 374 | 27 |
| 11 | 243 | 37 | 23 | 390 | 27 |
| 12 | 257 | 35 | 24 & Over | 408 | 27 |

(3) Replace NFPA-54 section 5.5.1 with the following:

Elevated Pressure Piping to be Labeled: Piping supplying gas at a pressure greater than ½ P.S.I.G. or 14 inch water column shall be labeled:

(a) at a minimum of every ten feet;

(b) at all changes of direction;

(c) on each side of a penetration through a partition, wall or ceiling; and,

(d) at every gas shutoff valve.

(e) The labels shall:

1. be colored yellow with black lettering;

2. indicate the type of gas and the pressure contained within the piping system; and

3. the letters shall be sized so that the labeling can be read from a normal line of vision when standing at the main floor level.

(4) Revise NFPA-54 section 5.6.2.1 as follows:

Cast-iron and Galvanized Pipe and pipe fittings shall not be used.

(5) Replace NFPA-54 section 5.6.2.2 with the following.

Steel and Wrought-Iron.

(a) Steel and wrought-iron pipe shall be at least of standard weight (schedule 40) and shall comply with one of the following standards:

**5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03**

    1. ANSI/ASME B36.10, *Welded and Seamless Wrought-Steel Pipe*

    2. ASTM A 53, *Standard Specification for Pipe, Steel, Black and Hot Dipped, Zinc-Coated Welded and Seamless.*

    3. ASTM A 106, *Standard Specification for Seamless Carbon Steel Pipe for High-Temperature Service.*

(b) Welding of gas piping systems with pressures under or equal to 70 P.S.I.G shall be performed according to the following:

    1. Welding will be performed by a qualified welder who is a licensed plumber or gas fitter, or under the direct supervision of a licensed plumber or gas fitter. The welding shall conform to a Welding Procedure Specification (WPS), accompanied by a Procedure Qualification Record (PQR), which will be available to the Inspector.

    2. The WPS and PQR must be in accordance with one of the following:

        a. American Welding Society (AWS) B2.1

        b. American Petroleum Institute (API) 1104

        c. ASME Section IX

    3. The installation shall meet the following Inspection criteria:

        a. A visual Inspection as to the quality of the weld shall be performed in accordance with AWS D1.1 or API 1104 standards

        b. The test pressure used during an Inspection shall comply with the following:

            i. Systems with a maximum operating pressure of ten P.S.I.G. or less, shall be tested to a minimum of three P.S.I.G. or ten times the operating pressure, whichever is greater.

            ii. Systems with an operating pressure greater than ten P.S.I.G. and less than 70 P.S.I.G. shall be tested at 100 P.S.I.G.

            iii. The test duration shall be one hour for every 100 feet of pipe, or fraction thereof. The minimum test duration shall be one hour and the maximum test duration shall be 24 hours, irrespective of system design.

(c) Welding on gas piping systems with pressures over 70 P.S.I.G. shall be performed according to the following:

    1. All welds shall be full penetration and performed by a qualified welder.

    2. All welds shall be subjected to a 100% X-ray or 100% Ultrasonic Examination (UT) test.

    3. The manifolding in any combination of gas regulators and relief vents is prohibited

    4. All Socket Welded Type Joints on gas piping supplying pressures over 70 P.S.I.G. shall require a magnetic particle test or other recognized non-destructive test.

    5. The gas piping system shall be pressure tested to a minimum of 1.25 times the gas piping systems working pressure.

        a. The test duration shall be a minimum of one hour.

        b. The test shall be witnessed by the Inspector.

**5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03**

6. The testing company and their authorized field agent that provides the (UT) field examination shall be certified by a recognized and accredited agency in such testing. A copy of the AWS certification shall be submitted to the Board prior to the examination.

7. Repairs that are made to welded joints that fail the X-Ray or (UT) test shall be re-tested and re-certified. For future reference; the failed welded joint that is re-tested shall be identified by stenciling ½ inch high white lettering at the weld location the date of the re-test.

8. The Board shall require an affidavit signed by the individual who performed the X-ray or (UT) examination for the testing agency. The affidavit shall state that all welds meet the requirements of the Welding Procedure Specification (WPS) and that all welds passed the X-Ray or (UT) examination.

(6) Replace NFPA-54 section 5.6.3.4 with the following:

For purposes of this section CSST shall mean corrugated stainless steel tubing systems.

Corrugated stainless steel tubing systems must be tested and listed in accordance with ANSI/LC-1-/CSA 6.26 and installed by manufacturer trained, licensed plumbers and gas fitters The system shall be sized in accordance with NFPA-54 - ANSI Z233.1 - 2002.

(a) CSST Fittings. All fittings and accessories used in the installation of CSST piping systems shall be approved by the CSST manufacturer for use with their system.

(b) CSST Concealed Fittings:

1. Where gas piping is to be concealed:

a. connections shall only be made with CSST fittings listed for use in concealed spaces; and

b. connections shall be produced by the manufacturer of the CSST piping system.

2. Malleable fittings shall be permitted in concealed locations when used in combination with CSST fittings.

3. For each malleable fitting there shall only be a single CSST connection.

(c) Repairs to Concealed CSST Piping:

1. Repairs required in a CSST system which is concealed, or otherwise not readily accessible, shall be repaired with a fitting listed for the CSST system being used.

2. Installation of an access panel shall be required at the repair site.

(d) Interior Meter Connections: Interior meter connections may be directly connected to the CSST system as long as the meter is securely affixed to the building, and the CSST is secured to the building structure when 24 inches or more of tubing is exposed.

(e) Exterior Meter Connections:

1. No CSST shall be connected to an exterior meter.

2. The tubing shall terminate at the foundation wall with a termination fitting, and the meter shall be rigidly connected with steel piping to the building structure.

5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03

(f) Sleeved Gas CSST:

1. CSST shall be sleeved when passing through a metal or concrete deck to protect the integrity of the tubing and be fire - stopped in accordance with the State Building Code.

2. The sleeve shall be Schedule 40 black or galvanized pipe and shall extend a minimum six inches from the top of the finished floor and the underside of the deck.

(g) Only manifolds for CSST systems supplied and listed by the CSST manufacturer may be concealed.

1. Assembled manifolds shall be installed in an accessible location as defined in the 2002 NFGC - Z223.1.

2. Assembled manifold is a piping combination made up of close nipples and malleable tees.

(h) Fireplace Log Installations:

1. CSST shall terminate with a termination fitting at the entrance to the masonry fire box.

2. The workmanship shall be performed and completed in such a manner so that the termination will not be exposed to any adverse effects.

(i) Fixed Appliance Connection Using CSST: CSST may be directly connected to a fixed appliance when the following conditions are met.

1. The tubing is securely attached to the building structure or other means of solid support.

2. Tubing shall not run exposed for a distance greater than or equal to 30 inches without being physically attached to the building structure or other means of solid support.

3. CSST terminates with a proper fitting and gas cock.

(j) CSST Used Underground:

1. When in contact with the earth or other material that could corrode the piping, the CSST shall be installed within a sleeve designed to withstand the superimposed loads.

2. Except for pre-engineered sleeves that are Product-approved by the Board, the sleeve shall allow free movement of the CSST.

3. All sleeve ends shall be sealed liquid tight.

4. An acceptable tape marking system shall be in place no more than six inches from the top of the grade indicating that a gas line is below.

5. The minimum depth for buried gas piping as describe herein is 18 inches from the top of grade and the minimum size of the CSST to be buried is ¾ inch.

(k) CSST Used as an Appliance Connection: CSST shall not be used as a flexible appliance connector downstream of the appliance shutoff device.

(l) Sizing CSST Systems: CSST systems shall be sized and installed with a maximum 14 inch water column (½ P.S.I.G.) gas pressure unless Special-permission has been granted by the Board.

(m) CSST Installation and Modifications: Installation of CSST in the Commonwealth of Massachusetts shall be in

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    5

5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03

strict compliance with the manufacturer's instructions and the Massachusetts State Plumbing and Gas Code 248 CMR 3.00 through 7.00.

(n) Testing Requirements for CSST Systems:

1. Before any piping is covered, when CSST piping systems are installed in new construction or remodeling, the system shall be tested as part of the Inspection as prescribed under NFPA-54 Chapter 7.1 as modified under 248 CMR 5.05.

2. Before piping is connected to any appliance the licensed plumber or gas fitter shall do a second test of the system.

3. A tag shall be:

a. affixed to the meter or service manifold acknowledging this test; and

b. signed and dated by the licensed plumber or gas fitter.

(o) Liquid Leak Detector: No corrosive liquids shall be used in the testing of the CSST system. Some household soaps and detergents may be corrosive to gas and plumbing products.

(p) Exposed CSST Tubing: When CSST is installed outdoors or is subject to corrosive chemicals, exposed stainless CSST tubing (where the jacket has been removed) shall be recovered with tape as specified by the CSST manufacturer. (After the completion of testing.)

(q) CSST Piping Installed on Roofs: CSST shall be installed for roof top equipment only when it is supported by one of the following methods:

1. The CSST tubing with a UV stabilized jacket is supported the full length of the CSST run.

a. The tubing shall be affixed to a wooden plank or a steel channel that is securely attached by an appropriate method every six feet to the roof structure.

b. The tubing shall be attached directly to the support every six-feet.

2. The CSST tubing is installed within a metal or plastic conduit that is securely attached by an appropriate method every six feet to the roof structure. Where the piping system requires a tee to be installed within the line, the sleeve shall terminate no more than 12 inches from the tee on both runs and the branch line.

3. For CSST tubing having sizes of 1½ inch and two inches and having a UV stabilized jacket, the following requirements shall be satisfied:

a. the CSST shall be supported on blocks which are spaced not more than 48 inches apart.

b. The blocks shall be constructed of materials appropriate for outdoor conditions and shall be securely attached by an appropriate method to the roof structure, and

c. The method used to attach the CSST to the block shall not damage the plastic coating.

4. The maximum length of tubing not supported by any method listed shall not exceed 30-inches when connected to a gas fired roof top unit or similar gas equipment.

(7) Revise NFPA-54 section 5.6.7.4 by replacing it with the following:

5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03

Thread Compounds: Thread (joint) compounds (pipe dope) and pipe thread sealing tape (Teflon, etc.) shall be resistant to the actions of liquefied petroleum gas or to any other chemical constituents of the gases to be conducted through the piping.

(8) Revise NFPA-54 section 5.12 as follows:

5.12 Acceptable Shutoff Devices: Gas Cocks and Ball Valves installed for use shall either be listed by a nationally recognized testing agency or comply with applicable American Standard Approval or Listing Requirements and shall be Product-Approved by the Board. They shall:

(a) Have clearly indicated open and closed positions and rigidly secured stops to limit both extremes of rotation. W.O.G. Ball Valves lever or Tee Handle Type are acceptable.

(b) Show no evidence of leakage when subjected to an air pressure test of a six inch mercury column (3 P.S.I.G.) for ten minutes.

(c) Be capable of withstanding without deformation, breakage or leakage the following "Turning Effort" standards when screwed onto a pipe fitting:

| NOMINAL PIPE SIZE | TURNING EFFORT |
|---|---|
| ½ inch | 300 inch-pounds |
| ¾ inch | 450 inch-pounds |
| 1 inch | 600 inch-pounds |
| 1¼ inch | 700 inch-pounds |
| 1½ inch | 750 inch-pounds |
| 2 inch | 950 inch-pounds |
| 2½ inch | 1050 inch-pounds |
| 3 inch | 1050 inch-pounds |

(d) Have a capacity not less than that specified in the following table for 0.60 Specific Gravity, 1000 BTU Per Cubic Foot Gas at 1.0 inch water column pressure drop.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03

| NOMINAL PIPE SIZE | MINIMUM CAPACITY |
|---|---|
| ½ inch | 260,000 BTU Per hour |
| ¾ inch | 698,000 BTU Per hour |
| 1 inch | 1,192,000 BTU Per hour |
| 1¼ inch | 1,768,000 BTU Per hour |
| 1½ inch | 3,097,000 BTU Per hour |
| 2 inch | 5,346,000 BTU Per hour |
| 2½ inch | 6,859,000 BTU Per hour |
| 3 inch | 11,923,000 BTU Per hour |

(e) Each valve shall be marked in a conspicuous place with the manufacturer's name or trademark.

(Testing procedures for 5.12(b), (c), and (d) shall be consistent with those outlined in the American National Standard for Manually Operated Gas Valves).

(9) After NFPA-54 section 5.13 add a new section 5.14 as follows:

5.14 Installation of Consumer-owned Gas Pressure Boosters.

(a) When Special-permission has been granted by the Board and the serving gas supplier has granted its approval, consumer owned gas pressure boosters may be installed in that portion of the gas piping system extending from the outlet of the meter set assembly to the inlet of the equipment requiring the elevated pressure.

(b) Hermetically Sealed: Gas pressure boosters shall be of the hermetically sealed type. Any exception to this provision shall be noted in the applicant's Special-Permission request to the Board.

(c) Proper Location:

1. Gas pressure boosters shall be installed on a firm foundation or concrete floor and shall be free of vibration.

2. Gas pressure boosters shall be located in well-ventilated spaces and readily accessible for examination, replacement or necessary maintenance.

(d) Underpressure Protection Device: A manual reset low pressure shutoff device shall be installed between the gas

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.                8

**5.03: Modifications to sections of NFPA-54, Chapter 5, 248 MA ADC 5.03**

pressure booster and the gas meter to protect against a reduction in supply pressure lower than that acceptable to the serving gas supplier.

(e) Additional Provisions:

1. Gas pressure boosters shall be installed and maintained in accordance with the manufacturer's instructions.

2. The gas equipment for which the booster is required, shall be equipped with a properly set, low gas pressure switch that will prove the correct pressure is available before startup.

3. Check valves shall be installed to prevent the increased pressure from pressurizing the system upstream of the booster. Where bypasses are installed they shall include a shutoff valve and a check valve.

4. A pressure regulator to maintain a constant outlet pressure shall be installed immediately downstream of the booster (exception: not required if the booster has an integral pressure regulator).

Current through May 23, 2014, Register #1261

Mass. Regs. Code tit. 248, § 5.03, 248 MA ADC 5.03

End of Document                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

The Official Website of the Office of Consumer Affairs & Business Regulation (OCABR)

# Consumer Affairs and Business Regulation

⌂Home › Agencies › Agencies and Divisions › Division of Professional Licensure › Regarding Corrugated Stainless Steel Tubing (CS

# Regarding Corrugated Stainless Steel Tubing (CSST)

Enacted **February 4, 2009**

1. WHEREAS, Corrugated Stainless Steel Tubing ("CSST") is subject to nearby (a.k.a. indirect) lightning strikes causing electrical arching which can rupture CSST products leading to property damage and potential injuries or death;

2. WHEREAS, without prior approval by the Board of State Examiners of Plumbers and Gas Fitters ("Board"), it appears manufacturer installation requirements have been changed to require adherence to additional bonding requirements which has now been addressed in NFPA 54, 2009 edition (not adopted in Massachusetts) and given that the Board has not previously approved a CSST product with special lightning protection installation provisions;

3. WHEREAS, certain CSST manufacturers have informed the Board that, when applicable, the additional bonding of CSST piping must be performed by licensed electricians because the new bonding requirements are an enhanced version of bonding required to protect buildings from ground faults, which fall within the purview of electricians and given that these manufacturers previously acknowledged that the additional bonding may not be authorized in Massachusetts, or in the alternative, if authorized, may not be enforceable in Massachusetts by any relevant authorities;

4. WHEREAS, based on the limited information before it that the additional bonding was required for public safety, the Board temporarily rescinded product approval for CSST piping on November 26, 2008 to allow for resolution of the enforcement/requirement of extra bonding by the relevant authorities having jurisdiction;

5. WHEREAS, on January 16, 2009, the Board of Fire Prevention Regulations issued an interpretation finding that additional bonding required by manufacturers would not violate the Massachusetts Electrical Code but made no statement on the enforceability of said requirements.

Now, therefore, the Board, after due consideration and in conjunction with meetings held with the manufacturers, immediately reinstates the previously approved CSST products in Massachusetts pursuant to these provisions;

1. The Board typically requires products to meet national standards for assurances that they are safe for public use; however, the Board has been unable to identify any national standard for protection of CSST piping (or any piping in general) from indirect lightning strikes. Therefore, pending the adoption of such a standard, and, solely based on evidence provided by manufacturers, the Board accepts the following measures as mitigation for damages from indirect lightning strikes:

   a. Direct Bonding of CSST piping - Manufacturers have provided evidence from a testing center, Lightning Technologies Inc. of Pittsfield, Massachusetts, that additional bonding of CSST products via a bonding jumper helps mitigate damages from indirect lightning strikes.

   b. One other manufacturer, OmegaFlex, has also provided evidence from Lightning Technologies Inc. of Pittsfield, Massachusetts, that its product, also mitigates the damages from indirect lightning strikes due in part to a special jacket material.

2. Using a bonding jumper with CSST falls outside the scope of plumbing and gas fitting, therefore plumbers cannot be required or otherwise held responsible for adhering to manufacturer's instructions regarding such bonding (be it direct or other types covered by the electrical code). It appears that licensed electricians, adhering to the regulations/codes

adopted by the Board of Fire Prevention Regulations, have exclusive jurisdiction over the additional CSST bonding. Therefore, if the manufacturer's instructions require use of a bonding jumper, then such work shall be done in accordance with applicable law, which includes the pulling of any required electrical permits.

3. Instructions from manufacturers often reference adherence to the "latest edition" of NFPA 54 which is ambiguous. As the 2009 edition requires a type of direct bonding, the Board, via this policy, places the burden on manufacturers to clarify whether such bonding will be required for that particular product.

4. The Board is adopting this policy based on manufacturer representations that their efforts at mitigating indirect lightning strikes are effective. Should the Board receive evidence to the contrary, or a new standard be adopted which the manufacturer's do not adhere to, the Board reserves the right to reconsider this policy as well as past and future product approvals, to the extent allowed by law and in the best interests of public safety.

5. Like all other plumbing and gas products, manufacturers must seek Board approval prior to making any other changes to their installation instructions. New CSST products will be similarly reviewed to ensure that steps have been taken to mitigate the effects of indirect lightning strikes.

6. It shall be the duty of manufacturer's to educate their Massachusetts installers of the above provisions as soon as possible.

© 2014 Commonwealth of Massachusetts.

Mass.Gov® is a registered service mark of the Commonwealth of Massachusetts.